MCI COMMUNICATIONS CORPORA-
TION et al., Plaintiffs,

v.

AMERICAN TELEPHONE &
TELEGRAPH COMPANY et
al., Defendants.

No. 74 C 633.

United States District Court,
N. D. Illinois, E. D.

Oct. 6, 1978.

Robert F. Hanley, Chester T. Kamin, Richard J. Gray, Vicki A. Thompson, Christopher J. McElroy, Alfred Y. Kirkland, Jr., Raymond C. Fay, John R. Worthington, Jenner & Block, Chicago, Ill., for plaintiffs.

George L. Saunders, Jr., Theodore N. Miller, Michael S. Yauch, Kenneth K. Howell, Gerald A. Ambrose, Sidley & Austin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

MCI Communications Corporation ("MCI"), a specialized communications common carrier engaged in providing private line communications services for businesses and government agencies between their offices in different cities, is suing the American Telephone & Telegraph Company ("AT&T") and its affiliated companies for a conspiracy in restraint of trade, monopolization, attempted monopolization, and conspiracy to monopolize. The complaint is based on the following events. In 1973, MCI sought approval of construction permits for a microwave transmission system between Chicago and St. Louis. (Complaint, par. 17).[1] This system, if approved, would directly compete with AT&T Long Lines for the data communications business of the government and private companies, the market of which AT&T controls a 90 per cent share. (Complaint, pars. 7, 22). In 1969, the FCC granted MCI construction permits for the Chicago to St. Louis route and ordered AT&T to interconnect MCI's intercity transmission system with the Bell System's intracity network. (Complaint, par. 17).

During the pendency of MCI's application, AT&T allegedly initiated a massive publicity campaign directed at the public, MCI's potential customers, state and federal regulators, Congressmen, and the Executive Branch, asserting that competition in the provision of business and data communications services would damage the national telephone network and asking for a "moratorium on competition" in that field. (Complaint, par. 23(m)). Also during this period, AT&T expanded at an unprecedented rate its circuits which transmitted private line business and data communications. (Complaint, par. 23(i)).

After MCI received approval for the Chicago-St. Louis construction and the FCC ordered interconnection, AT&T allegedly engaged in numerous other activities designed to maintain Long Lines' monopoly power in the business and data communications market. (Complaint, par. 23). AT&T's local affiliates refused to interconnect MCI to various services, such as common control switching arrangements ("CCSA") and intercity private line service ("FX"), to points beyond metropolitan distribution areas, to cities not serviced by MCI, to independent telephone carriers, and to other specialized common carriers who serviced cities not serviced by MCI. (Complaint, par. 23(a)). For any potential customer who needed these interconnections, AT&T tied provision of the services and any expansion of distribution to the use of Long Lines' intercity transmission facilities. (Complaint, par. 23(h)). In those cases where AT&T's affiliates permitted interconnection, they furnished interconnection on unilateral and discriminatory terms. The rates charged MCI for installation and maintenance were higher than those charged for Bell subsidiaries. (Complaint, par. 23(b)(1), (6), and (7)). The quality of

---

1. In substantially the same manner, MCI has also sought and received FCC approval for construction of intercity microwave transmission between New York and Chicago, St. Louis and Dallas, and Toledo and Detroit. (Complaint, par. 18). Interdata Communications, Inc. ("Interdata"), a second plaintiff in this action, has received approval for similar construction between New York and Washington. As this considerable activity suggests, MCI intends to expand its facilities into an intercity, transcontinental microwave network. (Complaint, par. 18).

the interconnection received by MCI was lower than that provided to Bell subsidiaries, in that the local affiliates supplied low grade equipment, inadequate circuitry, inadequate technical information, inadequate follow-up on complaints, and poor repair service to MCI. (Complaint, par. 23(c)(2)–(4), (d), and (e)). In addition, the local affiliates imposed significant geographic and customer restrictions upon MCI's interconnections. (Complaint, par. 23(b)(3)–(5)). When MCI protested about these interconnection practices to the FCC, AT&T allegedly filed sham tariffs before various State regulatory commissions which sought to deny MCI the interconnections ordered by the FCC. (Complaint, par. 23(1)).

AT&T then initiated a campaign to harass MCI's present customers, to discourage potential customers from buying MCI's service, and to disparage MCI generally throughout the business and financial community. To discourage potential customers, AT&T caused the filing of "mirror" and "experimental" tariffs with the FCC for the Chicago-St. Louis routes. (Complaint, par. 23(g), (j)). These tariffs offered lowered rates and greater services than those supplied by MCI, but at the time of filing, AT&T knew that it did not have the ability to provide the breadth of services or to charge the low rates established in the tariff. (Complaint, par. 23(j)). Nevertheless, AT&T publicized the tariff's terms to potential customers in the business community and represented that it would soon provide the services contained in the tariff. (Complaint, par. 23(j)). In addition, AT&T threatened to withdraw advisory personnel and services from companies which purchased MCI's services. (Complaint, par. 23(f)(5)). As to MCI's present customers, AT&T required them to sign a customer authorization before proceeding with interconnection. (Complaint, par. 23(f)(1)). AT&T then supplied them with other AT&T services on a discriminatory basis and misrepresented to them that the terms of AT&T's new tariff would soon be available. (Complaint, par. 23(f)(2), (4)). Finally, in its more general publicity, AT&T dispar-

aged the safety and reliability of MCI's service, the aptitude and acumen of MCI's personnel, and the strength of MCI's financial position. (Complaint, par. 23(k)).

Although this case was filed in 1974 and the parties are near the completion of discovery, AT&T has now moved to dismiss the entire complaint. With the exception of the allegations of sham proceedings and lobbying, defendant argues, all the activities detailed in the complaint are within the exclusive jurisdiction of the FCC and are therefore impliedly immunized from the antitrust laws. The remaining allegations, defendants contend, fall within the *Noerr* immunity which protects certain forms of first amendment activity.

On the question of implied immunity, AT&T has made two interrelated, but quite distinct, arguments. The first is that the pervasive regulation of common carriers by the FCC under the "public interest" standard is necessarily and inherently inconsistent with the antitrust laws and that therefore all of AT&T's conduct should obtain a blanket immunity from the coverage of the antitrust laws. The second takes a fall back position. The argument is that even though all of AT&T's conduct may not be immunized, the FCC, in its pervasive regulation, has approved each of the allegedly anticompetitive activities of which MCI complains and that therefore AT&T should obtain at least ad hoc immunity from the antitrust laws.

In essence, both of these arguments rely on the doctrine of exclusive jurisdiction as distinguished from the doctrine of primary jurisdiction. The former doctrine is invoked when the enforcement of the antitrust laws is so plainly repugnant to agency administration of a regulatory statute that the antitrust court is ousted of jurisdiction. 7 von Kalinowski, *Antitrust Laws and Trade Regulation*: § 44A.02 (1977). Primary jurisdiction, on the other hand, is invoked when the defendant's conduct is arguably immune from anti-trust liability due to the regulatory statute or when the agency has jurisdiction over some

of the defendant's conduct and its decision would be of material aid in clarifying the antitrust issues. *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). Rather than dismissing the case entirely, as is required by a finding of exclusive jurisdiction, a court which applies the doctrine of primary jurisdiction merely stays its proceedings and refers certain factual or legal questions to the administrative agency for preliminary determination. *United States v. Philadelphia National Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). There are two primary reasons for this prior resort to the agency: the need for administrative uniformity, and "the need for administrative expertise in distilling the relevant facts in a complex industry." *United States v. Radio Corporation of America,* 358 U.S. 334, 347–48, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959).

 It is important to note at the outset that AT&T's assertions of immunity in this case are based on the doctrine of exclusive, as opposed to, primary jurisdiction. It is equally important to recognize that AT&T bases its arguments for exclusive jurisdiction not on an express grant of statutory immunity but on an implied grant of immunity. Given this posture, AT&T's claims of implied immunity must satisfy the exacting standard articulated by the Supreme Court: "Repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon v. New York Stock Exchange,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975). ". . . Repeal is to be regarded as implied only if necessary to make the [regulatory statute] work, and even then only to the minimum extent necessary." *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

## FEDERAL COMMUNICATIONS ACT

The question of implied immunity turns in considerable part on the legislative history and content of the regulatory statute.

Thus, we must begin by an analysis of the Federal Communications Act. Federal regulation of communications common carriers began with an amendment of the Interstate Commerce Act, in which communications carriers were brought under the jurisdiction of the Interstate Commerce Commission ("ICC") and were governed by the provisions of the Interstate Commerce Act. Mann-Elkins Act of 1910, 36 Stat. 539, 61st Cong., 2d Sess. (1910). A decade later, in recognition of a distinct problem confronting communications carriers, Congress conferred on the ICC the power to exempt from the antitrust laws those mergers or acquisitions of local telephone companies which were found to be in the public interest. Willis-Graham Act of 1921, 42 Stat. 27, 67th Cong., 1st Sess. (1921).

In 1934, Congress enacted the Federal Communications Act, the statute which severed regulation of the telephone, telegraph, and radio industries from the Interstate Commerce Commission and invested regulation over these industries in the newly created Federal Communications Commission ("FCC"). 47 U.S.C. §§ 151 *et seq.* The Act divided the regulated industries into common carriers, such as the telephone and telegraph companies, and radio broadcasters, and under the provisions of Title II, imposed stricter and more numerous regulatory controls over the common carriers. *United States v. RCA,* 358 U.S. 334, 348–350, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). With regard to the telephone industry, Congress recognized that, through a series of mergers and consolidations and through the creation of several holding companies, AT&T had achieved a monopolistic position in the provision of interstate message telephone toll service and interstate private line service. House Report No. 1273, Pt. 3, No. 1, 73d Cong., 2d Sess., pp. 856–860 (1934). Congress did not regard this growing concentration of economic power as necessarily injurious to the public, *id.* at 932, but it did believe that the ICC, under the Willis-Graham Act, should have scrutinized these transactions more closely for possible abuses in property valuation and for potential

injury to the affected telephone users. *Id.* at 930–932. Aside from the re-enactment of the power to exempt mergers from the antitrust laws, Congress did not address the possible anticompetitive effects which intentional maintenance of AT&T's recognized monopolistic position might create.[2] Rather, Congress concentrated on vesting the FCC with sufficient powers to insure that AT&T provided telephone users, both public and private, with nondiscriminatory and reasonable rates and with efficient, rapid and uniform services. S.Rep.No.781, 73d Cong., 2d Sess., pp. 1–3 (1934); 47 U.S.C. § 151.

The Federal Communications Act of 1934 grants the FCC fairly broad and general regulatory powers over the telephone companies and leaves to the FCC the task of defining the scope of these powers. S.Rep. No.781, 73rd Cong., 2d Sess., pp. 1–2 (1934). Under the Communications Act, the FCC possesses several powers which are central to its mission. Before a telephone company may discontinue service on a particular line or construct new lines, the Commission must certify that the discontinuance or construction serves the public convenience and necessity. 47 U.S.C. § 214(a)–(b). In controlling this entry into and exit from communications service, the FCC may also order one common carrier to interconnect its lines with those of another carrier. 47 U.S.C. § 201(a). Equally significant is the Commission's control and supervision over a telephone company's rates and practices. The Act declares that any unjust or unreasonable charge, practice, classification, or regulation is illegal, 47 U.S.C. § 201(b), and that any unjust or unreasonable discrimination or preference "in charges, practices, classifications, regulations, facilities, or services" is similarly illegal. 47 U.S.C. § 202(a). At least ninety days before implementing new charges or practices, the common carrier must file with the Commission a schedule, or tariff, embodying these charges or practices and must publish this tariff generally. *Compare* 47 U.S.C.A.

§ 203(b)(1) (Supp.1978) (ninety days) *with* 47 U.S.C. § 203(b)(1) (1970) (thirty days). The Commission may then hold a hearing to investigate the reasonableness of the charge or practice and may suspend its effective date for a maximum of five months. *Compare* 47 U.S.C.A. § 204(a) (Supp.1978) (5 months) *with* 47 U.S.C. § 204(a) (1970) (3 months). Most important, the Commission is empowered to determine whether a certain charge or practice is unjust or unreasonable and to prescribe in its stead a fair, just, and reasonable charge or practice. 47 U.S.C. § 205(a). The Commission may enforce its order by enjoining the carrier to cease and desist from violations and by assessing a $1,000.00 forfeiture for each day a violation continues. 47 U.S.C. §§ 205(a), (b). In addition, an injured party may seek damages for an unreasonable discrimination in a proceeding before the Commission or before the district court. 47 U.S.C. § 206.

The Commission also possesses several incidental powers. In order to detect potential accounting abuses, the Commission may establish the value of all or any part of a carrier's property and must stay informed of any improvements, retirements, and other changes in a carrier's property. 47 U.S.C. §§ 213(a), (c). In line with this same purpose, the Commission may prescribe the forms of account and record keeping and a carrier's allowable depreciation charges. 47 U.S.C. § 220. In addition, the Commission may require carriers to file their annual reports. 47 U.S.C. § 219.

## BLANKET IMMUNITY

■ In applying the *Silver* and *Gordon* standards to AT&T's first claim, we conclude that neither the Congressional intent nor the cases support a blanket immunity from the antitrust laws for communications common carriers. Unquestionably, Title II of the Communications Act subjects communications common carriers, like AT&T, to considerable regulatory supervision and control. As the Supreme Court has re-

---

**2.** For example, Congress deferred any decision on whether to require competitive bidding in the furnishing of equipment, services, and cred-

it where the same company or group of companies were both buyers and sellers. H.R.No. 1850, 73d Cong., 2d Sess., p. 3 (1934).

marked in finding no reason for applying the doctrine of primary jurisdiction, " 'In contradistinction to communication by telephone and telegraph, which the Communications Act recognizes as a common carrier activity and regulates accordingly . . . , the Act recognizes that broadcasters are not common carriers and are not to be dealt with as such. Thus the Act recognizes that the field of broadcasting is one of free competition.' " *United States v. RCA,* 358 U.S. 334, 349, 79 S.Ct. 457, 466, 3 L.Ed.2d 354 (1959) (citations omitted). Despite this regulation of the telecommunications industry, however, there is simply no indication, either from the expressions of legislators or from the structure of Title II, that Congress intended to take the extraordinary step of immunizing all conduct of the telecommunications industry from the antitrust laws. *United States v. American Tel. & Tel. Co.,* 427 F.Supp. 57, 60 (D.D.C.1976). *But see,* Note, *AT&T and the Antitrust Laws: A Strict Test for Implied Immunity,* 85 Yale L.J. 254 (1975).[3] Absent such a clear indication, the presumption against implied repeal must prevail.

■ This conclusion is bolstered by the Supreme Court cases which have ruled on the implied immunity question. Although the Court has, in discrete instances, held that a regulatory statute may immunize particular conduct, the Court has consistently refused to grant blanket immunity to any regulated industry. It is significant that rejections of blanket immunity have occurred in three industries to which the Court has been most generous in granting immunity for particular conduct: the securities industry, *Silver v. New York Stock Exchange,* 373 U.S. 341, 360–361, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); the airline industry, *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 305, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); and the shipping industry, *Federal Maritime Commission v. Seatrain Lines, Inc.,* 411 U.S. 726,

733, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973). In the telecommunications industry, where it has never immunized conduct even on an ad hoc basis, it seems extremely unlikely that the Court would take the far more sweeping and unprecedented step of granting blanket immunity.

■ AT&T counters this absence of Congressional intent and the absence of Supreme Court authority by pointing to the part of the statute which requires the FCC to regulate AT&T in the "public interest." According to AT&T's argument, this standard, which pervades all FCC regulations, is categorically inconsistent with the standard of competition required by the antitrust laws. Although we agree that in particular instances the two standards may necessarily conflict, we believe that AT&T's argument is far too broad. The Supreme Court has recognized that under the Communications Act the "encouragement of competition as such has not been considered the single or controlling reliance for safeguarding the public interest." *FCC v. RCA,* 346 U.S. 86, 93, 73 S.Ct. 998, 1003, 97 L.Ed. 1470 (1953). On the other hand, the Supreme Court has also affirmed that "there can be no doubt that competition is a relevant factor in weighing the public interest." 346 U.S. at 94, 73 S.Ct. at 1004. Thus, in any given instance, the FCC may consider competition in determining the "public interest" and may decide to regulate in such a way as to maximize competition. In such an instance, the "public interest" standard and the competitive standard are consistent rather than conflicting. In the abstract then, we cannot say that regulation in the "public interest" necessarily and categorically conflicts with the standard of competition embodied in the antitrust laws. Therefore, FCC regulation in the name of the "public interest" does not give AT&T total immunity from the antitrust laws. We thoroughly agree with Judge Greene's holding on this issue:

---

**3.** It is not surprising that there is a paucity of legislative history on the issues presented by this complaint, for although Congress recognized AT&T had a natural monopoly over telephone service within a local community, Congress could hardly have anticipated the technological innovations which have eliminated the conditions of natural monopoly in private line, intercity transmissions.

In such a posture, the abstract philosophical differences between regulation and competition will hardly serve to oust the antitrust laws from their normal function and effect. The purpose of the implied immunity rule is to eliminate adherence to antitrust standards when there are irreconcilable differences between the antitrust laws and federal regulatory statutes. But the antitrust laws cannot be held hostage to a supposed irreconcilability between antitrust and regulatory enforcement when no irreconcilability exists in fact, nor can the alleged unlawful actions of defendants be deemed protected from the Sherman Act by the cloak of generalized regulation of AT&T by the Commission.

United States v. American Tel. & Tel., 461 F.Supp. 1314, at 1328 (D.D.C. 1978).

## PARTICULAR IMMUNITIES—THE CASE LAW

Before turning to an examination of the particular conduct alleged in the complaint, we think it necessary to consider the teaching of the numerous Supreme Court cases which have addressed the question of implied antitrust immunity. In the earlier cases, before the proliferation of administrative agencies, the Court did not clearly distinguish between the doctrines of exclusive and primary jurisdiction. Even after a clear recognition of this distinction, however, many of these cases are difficult and sometimes seem irreconcilable. Given this apparent irreconcilability, the safest course might be to consider each case as *sui generis* for a particular statute and for a particular industry. Yet, we think it possible and necessary to derive some principles of fairly general application. The effort seems particularly appropriate in this case, since the Supreme Court has never addressed the application of the antitrust laws to the telecommunications industry.

■ Essentially, there are two instances in which the strong presumption against implied repeals has been overcome and the Court has implied an immunity from the antitrust laws. The first occurs when the statute provides that an agency may regulate an industry under standards which are a substitute for those embodied in the antitrust laws. *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 302 n. 13, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). An example of such a statute is the Civil Aeronautics Act, which confers upon the CAB the power to investigate and enjoin unfair practices and unfair methods of competition. *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). In such an instance, where Congress has provided substitute antitrust enforcement, the Court will imply an immunity from the Sherman Act, whether or not the agency has exercised its antitrust authority. Otherwise, "if the courts were to intrude independently with their construction of the antitrust laws, two regimes [of antitrust administration] might collide." 371 U.S. at 310, 83 S.Ct. at 485.

■ The second instance in which an immunity may be implied occurs when the statute confers authority on an agency to regulate specific conduct which might be anticompetitive and the agency has, under the aegis of that authority, either required, approved, or sanctioned the anticompetitive conduct at issue. *Essential Communication Systems, Inc. v. American Tel. & Tel. Co.,* 446 F.Supp. 1090 (D.N.J.1978).[4] Here, there are essentially two requirements: statutory authority and agency sanction. The scope of the agency's authority can be determined by a reading of the regulatory statute itself and its legislative history. When the legis-

---

4. In the cognate area of the State action exemption, it is an insufficient ground for implying immunity that the "anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975).

In fact, "the Court has already decided that state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 592–93, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (footnotes omitted).

lative history is scant, however, the inquiry focuses on the degree of agency involvement in the anticompetitive conduct, that is, the degree to which a government regulator or a duly recognized self-regulatory body has limited the regulatee's independent business judgment and constrained the regulated industry to engage in anticompetitive conduct. Sufficient agency involvement from which to imply immunity may vary from outright agency approval, *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), to Congressionally acknowledged, continuing regulatory supervision, *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), to failure of an agency to disapprove of self-regulated conduct, *United States v. National Association of Securities Dealers, Inc.,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).[5] If, on the other hand, an agency has considered the particular conduct at issue but has expressly denied it approval or expressly declared it inconsistent with regulatory goals, a claim of implied immunity must be rejected because of the failure to satisfy the threshold requirement of a repugnancy between the regulatory and antitrust regimes.[6]

■ Since the principles governing this area are not always easy to apply, the reasoning behind the Supreme Court's decisions may also be a useful guide. A primary reason for implying immunity is often "that to deny antitrust immunity with respect to [the conduct at issue] would be to subject the [regulated entity] to conflicting standards." *Gordon,* 422 U.S. at 689, 95

S.Ct. at 2614. In the first instance we have posited, where the statute substitutes the agency as the vindicator of antitrust principles, the failure to imply immunity could subject a regulated entity to conflicting versions of the needs of competition. In the second instance we have posited, the failure to imply immunity would subject the regulated entity to the competitive standard of the antitrust laws and to what, in a given instance, may be the anticompetitive standard of the regulatory statute. A second major reason for finding immunity is that the regulator has so curtailed the regulated entity's activities by its pervasive regulation that the conduct at issue is really not the product of the defendant's independent business judgment. In this regard, the Court has observed, "In each case, notwithstanding the state participation in the decision, the private party exercised sufficient freedom of choice to enable the Court to conclude that he should be held responsible for the consequences of his decision." *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 593, 96 S.Ct. 3110, 3119, 49 L.Ed.2d 1141 (1976).[7] "In every sense, the question faced by the parties was solely one of business judgment (as opposed to regulatory coercion), save only that the Commission must have found that the 'public interest' would be served by their [alleged anticompetitive conduct]." *United States v. RCA,* 358 U.S. 334, 350–51, 79 S.Ct. 457, 467, 3 L.Ed.2d 354 (1959) (citations omitted). Thus, when the allegedly anticompetitive conduct is the product of independent business judgment rather than regulatory constraint, the need to imply immunity disappears.[8]

5. Unlike the first type of implied repeal, the second does not require as a condition that the agency supply a remedy which is equivalent to antitrust remedies. *Gordon, supra,* 422 U.S. at 690 n. 15, 95 S.Ct. 2598, n. 15.

6. The close, and unresolved, case occurs when the agency has neither expressly approved nor expressly disapproved of the conduct at issue. Since, in that case, the agency has not put its full weight behind the conduct but has merely acquiesced in it, any conflict between the regulatory and antitrust regimes is potential rather than actual. *Compare Otter Tail Power Co.,* 410 U.S. 366 at 376–77, 93 S.Ct. 1022, 35

L.Ed.2d 359 *with Gordon,* 422 U.S. at 690–91, 95 S.Ct. 2598.

7. Of course, this quotation appears in a case where the claimed exemption derived from state, rather than federal, regulation. But, as the Court makes clear, Congress did not intend "state regulatory agencies to have broader power than federal agencies to exempt private conduct from the antitrust laws." 428 U.S. at 596, 96 S.Ct. at 3120.

8. A third reason sometimes offered for implying immunity is the need to preserve the uni-

Although these Supreme Court cases supply the foundation of our analysis, it is important to note one respect in which they differ from the instant case. For the most part, the plaintiffs in the Supreme Court cases were complaining of conduct which was either a *per se* violation of § 1 of the Sherman Act or a violation of § 7 of the Clayton Act. In such cases, the complaint focused primarily on one type of activity, such as agreements to fix prices, *Keogh v. Chicago & North Western R. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); concerted refusals to deal, *United States v. National Association of Securities Dealers, Inc.,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975); agreements to horizontally divide markets, *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); and mergers or acquisitions between competitors, *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). If the court found that this discrete activity was necessary to make the regulatory scheme work, the Court immunized the activity, thereby disposing of the case. In the case at bar, plaintiff is complaining primarily of monopolization and attempted monopolization. To show the intent necessary for these § 2 violations, plaintiff has alleged a scheme consisting of a plethora of activities, no one of which is necessary to prove the violation. Standing by themselves, each of these activities may be perfectly legal, but when they are concatenated, a pattern may emerge which demonstrates a clear and conspicuous violation. Thus, unlike the *per se* or § 7 violations, what is often crucially important under § 2 is a pattern of conduct rather than one discrete activity.

■ This distinction has several implications. First, since what is of paramount significance is the pattern of conduct, no one of the activities alleged by MCI is nec-

essary to show the requisite intent. Thus, a finding of isolated immunity will not require dismissal of the entire complaint. Second, each of the activities comprising the pattern may be perfectly legal. As the Seventh Circuit has observed, "acts which may be legal and innocent in themselves, standing alone, lose that character when incorporated into a conspiracy to restrain trade." *Kurek v. Pleasure Driveway & Park Dist. of Peoria,* 557 F.2d 580, 587 (7th Cir. 1977). "If the end result is unlawful, it matters not that the means used in violation may be lawful." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972). In its motion to dismiss, AT&T has severed each particular activity alleged in the complaint and has sought to demonstrate the FCC's exclusive jurisdiction over that activity. In an analytical sense, this is justified, for as we remarked earlier, the Supreme Court has endorsed an approach which implies ad hoc immunity for discrete conduct rather than blanket immunity for a whole pattern of conduct. From a practical standpoint, however, this vivisection could work an injustice. *See United States v. American Tel. & Tel.,* 461 F.Supp. 1314, at 1328 (D.D.C. 1978). Since each individual activity may be perfectly legal, the FCC could approve each particular activity after individual consideration, even though the FCC might not have approved the entire pattern of conduct if presented in the same proceeding. Although this suggests that a different analysis might be appropriate for violations arising from a pattern of conduct, we will follow the technique which analyzes each discrete activity. We will, however, hearken back to the distinction throughout this opinion.

## AGGREGATION OF TRADE RESTRAINTS

■ A significant portion of MCI's complaint details a variety of predatory acts from which AT&T's intent to monopo-

formity of the administrative scheme, but as we noted earlier, this reason, standing alone, more properly supports a finding of primary rather than exclusive jurisdiction.

lize may be inferred. These include the initiation of sham proceedings, (Complaint, par. 23(g), (j), (1)); the tying of common control switching arrangements, interchange circuits, and nearby city service to intercity private line transmission, (Complaint, par. 23(h)); the interference with MCI's customers through threats and harassment, (Complaint, par. 23(f)); false advertising of AT&T's services, (Complaint, par. 23(f), (j)); and disparagement of MCI's ability both to the trade and the financial community, (Complaint, par. 23(k)). In its brief, AT&T does not appear to argue that the FCC has exclusive jurisdiction over the initiation of sham proceedings[9] and the tying of services,[10] and we therefore conclude that, pending the resolution of the *Noerr* immunity question, these first two predatory acts are concededly within our antitrust jurisdiction. As to the other three categories of predatory acts, however, AT&T takes a distinctly different position. Unquestionably, harassment of a competitor's customers, 1 von Kalinowski, *Antitrust Laws and Trade Regulation*: § 1.03[2][e]

(1978), false and deceptive advertising, *see generally,* 6 von Kalinowski, *Antitrust Laws and Trade Regulation*: § 41.04 (1978), and trade disparagement, 1 von Kalinowski, *Antitrust Laws and Trade Regulation*: § 1.03[3][c] (1978), are traditional acts of unfair competition which may form the basis for a charge of illegally maintaining a monopoly.[11] AT&T argues that the exclusive jurisdiction over and exclusive remedy for these traditionally anticompetitive acts lies in the FCC and that therefore the district court should be ousted of its normal antitrust jurisdiction. In essence, AT&T is seeking to show that, as to these traditionally anticompetitive activities, the FCC provides a substitute for normal antitrust enforcement under the first of the two theories of exclusive jurisdiction we outlined in an earlier part of this opinion.

■ The starting point for finding implied repeal of the antitrust laws due to a regulatory authority's substitute scheme of antitrust enforcement is the case of *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d

9. This is not particularly surprising for, unless the FCC permits the assertion of counterclaims at the allegedly "sham" tariff proceeding, the only remedy the FCC can provide is denial of the old tariff and prescription of a new one. Denial, however, would not remedy the anticompetitive effect such proceedings could have on a competitor which is put to the expense of opposing the tariffs. By way of an appendix to its reply, AT&T has intimated that the FCC has exclusive jurisdiction over sham tariff filings. AT&T has cited no cases holding that an administrative agency is the sole judge of sham proceedings which cause competitive injury, and we, too, have been unable to find any authority supporting this unusual proposition. *See generally,* 7 von Kalinowski: *Antitrust Laws and Trade Regulation* § 46.04 (1978). We, therefore, conclude that the federal court has antitrust jurisdiction over "sham" abuses of the regulatory process.

10. In the supplemental briefs addressed to this section of the complaint, the parties have agreed that the tying allegation is based on the same facts and is subject to the same legal principles as the allegations about AT&T's interconnection practices and its FCC tariff filings. Our discussion of these, therefore, is equally dispositive of the tying allegation.

11. Interestingly, this principle was upheld in a case upon which AT&T places heavy reliance,

*Seatrain Lines v. Pennsylvania R. Co.*, 207 F.2d 255 (3d Cir.), *cert. denied* 345 U.S. 916, 73 S.Ct. 727, 97 L.Ed. 1350 (1953). In *Seatrain*, the Third Circuit dismissed a portion of an antitrust complaint, holding that the defendant railroads were impliedly immune from an antitrust suit brought to enjoin a car exchange program over non-through routes where the court's injunction would interfere with a car exchange program expressly approved by the ICC. Plaintiffs in *Seatrain*, however, had also alleged acts of trade disparagement and sham litigation. *Id.* at 257. The Third Circuit held that those acts of disparagement and sham litigation which were not directly based on the approved car exchange program stated a claim for antitrust violations and remanded to the district court for a trial of these allegations should Seatrain desire to proceed. *Id.* at 262. It is significant that the Third Circuit found the proper forum for trial of these allegations to be the district court rather than the ICC, for throughout much of its brief, AT&T has argued that the FCC's exclusive jurisdiction is analogous to the ICC's exclusive jurisdiction. If we were to view this analogy in the light of *Seatrain*, we would necessarily conclude that the FCC does not have exclusive jurisdiction over claims of trade disparagement and sham litigation.

325 (1963). In *Pan Am,* the United States charged that Pan Am had allocated territories between itself and its subsidiary, Panagra, by preventing Panagra from filing a petition with the CAB for a route extension from the Canal Zone to the United States. This horizontal division of markets allegedly occurred both before and after the enactment of the Civil Aeronautics Act in 1938. Under Section 414 of the Act, the Civil Aeronautics Board (CAB) was granted express authority to immunize from the antitrust laws conduct of any person which had been affected by CAB orders made pursuant to Sections 408, 409, and 412. *Id.* at 304, 83 S.Ct. 476. Under Section 411 of the Act, the CAB was given the power to investigate complaints of "unfair or deceptive practices or unfair methods of competition in air transportation" and to order an air carrier to cease and desist from such practices. *Id.* at 302, 83 S.Ct. at 481. Although the express immunity did not cover all of the conduct charged, the Court held that, as to conduct occurring both before and after 1938, repeal of the antitrust laws should be implied from the CAB's authority under Section 411 and its use of a "public interest" standard which expressly required the CAB to consider effects on competition. *Id.* at 309, 83 S.Ct. 476.[12] In reaching this conclusion, the Court distinguished an earlier case by observing that under its Section 411 authority to issue cease and desist orders, the CAB was empowered to grant the only antitrust relief sought by the United States, divestiture. *Id.* at 310, 83 S.Ct. at 485. The limited nature of the holding is apparent: "It seems to us, therefore, that the Act leaves to the Board under § 411 all questions of injunctive relief against . . . " the specific conduct charged—". . . the division of territories or the allocation of routes or against combinations between common carriers and air carriers." *Id.* at 310, 313 n.19, 83 S.Ct. at 485 n.19 (citations omitted). Thus, *Pan Am* teaches that in

order to find an implied repeal on the basis of a regulatory substitute for antitrust enforcement, there should be either express statutory authority for a regulator's enforcement of competition or a strong showing of legislative intent to that effect and a scheme of agency administration which can grant the relief which the antitrust plaintiff seeks. We turn then to consider whether the FCC has express statutory authority to hear complaints of unfair competitive conduct such as customer interference, false advertising, and trade disparagement and whether the FCC can provide the type of remedy for this conduct which plaintiff seeks.

Section 221 of the Federal Communications Act provides:

If the Commission finds that the proposed consolidation, acquisition, or control [of a telephone company] will be of advantage to the persons to whom service is to be rendered and in the public interest, it shall certify to that effect; and thereupon any Act or Acts of Congress making the proposed transaction unlawful shall not apply.

47 U.S.C. § 221(a). This is the only express statutory authority which permits the FCC to control alleged anticompetitive conduct. Unlike the statute analyzed in *Pan Am,* the Federal Communications Act does not have a section authorizing the FCC to grant relief from the variegated conduct included within the concept of "unfair competition." Our inquiry then could legitimately end by noting this crucial distinction. Yet, although there is no specific authority within *Pan Am* for such a liberal approach, we believe that the absence of express statutory authority may not necessarily require the conclusion that a regulatory authority cannot provide a substitute for antitrust enforcement if the legislative history strongly supports a contrary conclusion.[13] In this

---

**12.** Unlike the Civil Aeronautics Act, the Federal Communications Act does not specify any particular components for the "public interest."

**13.** In cases of repeal under the second theory we have outlined, a strong showing of legisla-

tive history may tip the balance in favor of repeal. *See Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975).

case, however, the legislative history does not indicate that the FCC was given exclusive jurisdiction to remedy acts of unfair competition. Section 221 of the current Federal Communications Act was enacted as the Willis-Graham amendment to the Interstate Commerce Act. Willis-Graham Act of 1921, 42 Stat. 27. In the Senate hearings on this amendment, the Committee recognized that there existed considerable competition between AT&T and independent companies in providing innovative services and in obtaining finances. Joint Hearings on S. 1313 before the Joint Committee of Interstate Commerce, 67th Cong., 1st Sess. 17, 37 (1921). According to Committee members, the present Section 221 empowered the Commission to affect only that competition which resulted in duplicative local facilities and was not designed to affect the other forms of existing competition. *Id.* at 26. Throughout the hearings, the Committee members assumed that the Sherman Act and the state antitrust laws would continue to apply to abuses arising from the existing, unaffected competition between telephone companies. *Id.* at 26–27. In enacting the more comprehensive Federal Communications Act of 1934, Congress did not again address the issue of competition between telephone companies. Rather, "Congressional intent in creating the Commission was to supervise rates and service in the telecommunications industry to ensure protection of the public interest, and uniform, nondiscriminatory treatment of customers." *International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.,* 449 F.Supp.

1158, 1168 (D.Haw.1978) (citations omitted). In essence then, Congress designed the Commission to concentrate on discriminatory rates and services imposed on customers rather than on unfair competitive practices directed at competing telephone companies.[14] Given this Congressional silence in the 1934 Act, we are unable to conclude that the abuses of competition recognized by the Willis-Graham joint committee were to be exclusively controlled by the FCC rather than the federal courts. Therefore, nothing in the statute itself or its legislative history leads to the conclusion that the FCC has exclusive jurisdiction to remedy acts of unfair competition such as customer interference, false advertising, or trade disparagement.

Equally important, FCC proceedings do not provide the relief which MCI seeks. In its complaint, MCI prays for treble the damages its business sustained by reason of AT&T's exclusionary practices and for an injunction against AT&T's commission of future predatory acts. (Complaint, Prayer for Relief, par. 5, 7). AT&T suggests that the FCC proceedings can adequately remedy MCI's injuries. As to the damages MCI has allegedly suffered, AT&T argues that Sections 206–209 provide a perfectly adequate remedy. Section 206 states:

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common

14. AT&T has cited several FCC decisions in which the Commission has commented that it can remedy AT&T's anticompetitive practices. In each of these decisions, however, the FCC's authority to remedy anticompetitive effects arises only as an incident to one of the fundamental powers conferred by the Act rather than as an independent grant of power over unfair competition. Thus, the FCC may prescribe competitive conditions in the exercise of its authority under Section 214 to grant construction permits for telecommunications facilities. 62 FCC2d 977, 1046 (1977). Similarly, the FCC may remedy anticompetitive behavior as an incident to its regulation of rates and services: "In the event of the occurrence of

allegedly anticompetitive acts, AT&T points out that we have continuing, pervasive regulatory jurisdiction over AT&T's rates and services." 54 FCC2d 344, 347 (1976). What is significant here is that although the FCC may regulate anticompetitive practices as an incident to its primary powers, the FCC has not been given independent authority to remedy all manner of unfair competition. Thus, for example, if AT&T's trade disparagement is not connected to some practice over which the FCC has direct authority, the FCC would not have independent authority to control this AT&T activity.

carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained . . ., 47 U.S.C. § 206.[15] It is hardly necessary to point out that this section provides for single rather than treble damages. *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 692–93 (9th Cir. 1977), *rev'd on other grounds*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978). We believe there are two additional factors which make this an inadequate remedy. First, damages are provided only for violations of the Act. As we stated earlier, the Act is primarily designed to protect customers against unjust and discriminatory services rather than to protect competitors against unfair competitive practices. Thus, when MCI is complaining about an injury it has suffered as a customer of AT&T by reason of discriminatory service, MCI may have a remedy under Section 207. When, on the other hand, MCI is complaining of injuries it has sustained as a competitor which has been excluded from its legitimate share of the market, Section 207 provides no remedy whatsoever. *See generally, Nader v. FCC*, 172 U.S.App.D.C. 1, 24, 520 F.2d 182, 206 (1975).[16] Therefore, the damages remedy provided under the Act does not compensate for the competitive injury of which MCI is primarily complaining.[17] The second factor is that an FCC damages proceeding is simply not structured to handle the type of scheme charged by MCI. The Section 207 proceeding appears designed to consider one particular violation of the Act. Plaintiff, in this case, is alleging a broad scheme to monopolize composed of numerous individual unfair practices. Most of these individual instances are clearly not within the scope of this damages remedy. Of the few which arguably come within its scope, the proceeding would address them on an individual, piecemeal basis. From a piecemeal consideration, the trier might easily and erroneously conclude that the plaintiff had sustained no injury.[18] Thus, we must conclude that plaintiff's remedy for the acts of unfair competition alleged in the complaint is not adequate because Sections 206–209 do not provide for treble damages, do not compensate competitive injury, and only provide for piecemeal consideration of allegedly predatory acts.[19]

In summary, we have found that the FCC does not possess exclusive jurisdiction to determine and remedy the acts of unfair competition MCI has allegedly suffered.[20]

---

**15.** AT&T has neglected to note that this section does not vest the FCC with exclusive jurisdiction over such claims. Rather, the statute provides that the FCC and the district courts shall have concurrent jurisdiction but that the complainant is required to elect his forum. 47 U.S.C. § 207.

**16.** AT&T premises its argument on an FCC decision in which the Commission states that MCI has an administrative remedy under §§ 206–09 for AT&T's conduct. *In the Matter of MCI Telecommunications Corp.*, 62 FCC2d 703 (1976). It is important to note that the conduct at issue was AT&T's refusal to provide service and its discriminatory rate charges to MCI in MCI's capacity as a customer and not any allegedly predatory acts directed at MCI in its capacity as a competitor. Thus, the case does not support the conclusion that the FCC has plenary power to remedy telephone companies' acts of unfair competition.

**17.** The injunctive relief provided in Section 205 suffers from the same deficiency: unless an anticompetitive practice is connected to practices over which the FCC has express power, the FCC is unable to remedy the competitive injury by injunction.

**18.** As we said earlier, it is altogether possible that a Section 2 violation may emerge only after a pattern of conduct has been adduced.

**19.** *See also* the deficiencies of this remedy as discussed in the Exclusive Remedy section, *infra*.

**20.** Alternatively, AT&T attempts to argue that the FCC has either required or approved of AT&T's alleged customer interference, false advertising, and trade disparagement. One of the allegations in the paragraph on customer interference is that AT&T conducted surveys of MCI's customers. AT&T argues that in order to justify its rate tariffs, AT&T was required by FCC Regulation § 61.38(a) to conduct these surveys. Reading this allegation in conjunction with the others on customer interference and construing this allegation most favorably to the plaintiff, as we must on a motion to dismiss, we may conclude that the surveys were undertaken for the bad faith purpose of gathering information which could be used to threaten

This conclusion is based upon the absence of any express statutory authority or legislative history committing plenary power over acts of "unfair competition" to the FCC and upon the inadequacies of the FCC proceedings to remedy MCI's injuries. We believe MCI's position on this matter is clearly supported and that AT&T's is not; but even if the arguments of both sides were more evenly balanced, we would be guided by the clear Supreme Court mandate that implied repeals of the antitrust laws are strongly disfavored. Thus, we conclude that we have antitrust jurisdiction over the acts of unfair competition and over the tying arrangement and the initiation and prosecution of sham proceedings. If proved, these predatory acts could be more than sufficient, by themselves, to establish an intent to monopolize.[21] We need go no further to hold that MCI has stated a claim. In the interests of clarity and completeness, however, we will consider the two other major areas over which, according to AT&T, the FCC has exclusive jurisdiction—interconnection disputes and tariff filings.

## INTERCONNECTION PRACTICES

MCI has complained of several practices associated with the interconnection of MCI's intercity network to AT&T's local distribution facilities. These practices fall within one of three broad types. First, MCI claims that AT&T refused interconnection either to various services, such as CCSA and FX, to certain locations, such as nearby city or off customers' premises, or to certain facilities, such as those of independent telephone companies or of other specialized common carriers. (Complaint, par. 23(a)). Next, MCI complains that those interconnections which AT&T agreed to make imposed discriminatory charges and customer and geographic restrictions. (Complaint, par. 23(b)). Finally, MCI alleges that AT&T's subsidiaries delayed making these interconnections and harassed plaintiff and its customers during installation and servicing. (Complaint, par. 23(c)).

Undoubtedly, the FCC has statutory authority to regulate most of these practices. Under Section 201(a), the FCC may order one carrier "to establish physical connections with other carriers." 47 U.S.C. § 201(a). As the legislative history reveals, Section 201(a) was enacted to permit the FCC to modify the common law rule which held that there was no duty to interconnect facilities between carriers. *Woodlands Tel.*

MCI's customers rather than for the good faith purpose of supporting AT&T's tariff applications. In essence, AT&T is presenting its defense to this allegedly wrongful activity, but we are unable to evaluate the factual merit of this defense on a motion to dismiss.

On the charge of false advertising, AT&T quotes an FCC decision which concluded that the record was "barren of evidence" of AT&T advertising abuses. *In the Matter of American Telephone & Telegraph Co.*, 64 FCC2d 1 (1977). AT&T mischaracterizes this proceeding and thus the scope of FCC approval. The purpose of the proceeding was to determine whether AT&T's advertising expenses were so excessive that they should not be entirely borne by the ratepayer. The Commission never considered and, indeed, could not consider the content of AT&T's advertising, i.e., its truth or falsity. *Id.* at 85. Thus, the FCC only approved the inclusion of AT&T's advertising expenses as part of its rate and did not purport to approve the alleged misrepresentations contained in the advertising.

In the third FCC decision on AT&T's marketing practices, the Commission found that AT&T's expansion of its sales force was in the

"public interest." Economic Implications and Interrelationships Arising from Policies and Practices Relating to Customer Interconnection, 61 FCC2d 766 (1976). Again, the Commission was simply not investigating or commenting on the content of AT&T's marketing or its alleged anticompetitive effect.

Clearly, none of the decisions AT&T has cited demonstrate the FCC's approval of AT&T's acts of alleged unfair competition. Moreover, the decisions do not even demonstrate close FCC supervision of these practices. In most instances, the FCC's comments about marketing are incidental to the primary objective of ratemaking, 64 FCC2d 1, or are merely an afterthought, 61 FCC2d 766, 889.

21. AT&T invites us to characterize part of the complaint as central and the remainder as ancillary. *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). We decline to do so, because as we stated earlier, the scheme of monopolization alleged in this complaint does not lend itself to such marked distinctions.

Corp. v. American Tel. & Tel. Co., 447 F.Supp. 1261, 1266 (S.D.Tex.1978). Thus, this section supplies sufficient statutory authority for the FCC to reach outright refusals to interconnect or restrictions upon interconnection. (Complaint, par. 23(a)). Alternatively, the FCC has authority, under several other sections, to determine whether the imposition of charges and the provision of services, either related to interconnection or not, have been unreasonable or discriminatory. 47 U.S.C. §§ 201(b), 202(a). According to the legislative history, these sections were enacted to insure the uniform treatment of customers. *International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.,* 449 F.Supp. 1158 (D.Haw.1978). Since MCI was acting as a customer of AT&T in requesting these local interconnection services,[22] these sections provide considerable authority for the FCC to reach the discriminatory treatment complained of in paragraphs 23(b) and 23(c) of the complaint. The presence of such statutory authority satisfies the first condition of the second test outlined in the section on particular immunities. As one district court has observed, however, this is "a necessary, but not sufficient, condition." *Essential Communication Systems, Inc. v. American Tel. & Tel. Co.,* 446 F.Supp. 1090, 1095 (D.N.J. 1978). The critical question here is whether the FCC has employed its admitted statutory authority to approve or sanction AT&T's alleged anticompetitive conduct, thereby creating a plain repugnancy between the Communications Act and the antitrust laws. To answer this question, we must examine the regulatory history of private line, intercity communications.

In December 1963, MCI filed its application with the FCC for authorization under Section 214 to construct an intercity microwave radio system between Chicago and St. Louis. (Complaint, par. 16). Almost six years later, the FCC granted MCI the construction permits. *In re Applications of Microwave Communications, Inc.,* 18 FCC2d 953 (1969), *reh. denied* 21 FCC2d 190 (1970). "However, since the carriers [including AT&T] had indicated that they would not voluntarily provide loop service, the Commission retained jurisdiction to enable MCI to obtain a prompt determination on the matter of interconnection, and the Commission concluded that 'absent a significant showing that interconnection is not technically feasible, the issuance of an order requiring the existing carriers to provide loop service is in the public interest.'" *In the Matters of Bell System Tariff of Local Distribution Facilities for Use by Other Common Carriers,* 46 FCC2d 413, 419 (1974). As this decision indicates, the questions of local interconnection could not meaningfully be resolved until the intercity network was completed. Before completion of the Chicago-St. Louis network, however, the FCC initiated a broad policymaking and rulemaking proceeding on the general questions raised by the applications of specialized common carriers, like MCI, for entry into the private line communications field. *In the Matter of Establishment of Policies and Procedures for Consideration of Application to Provide Specialized Common Carrier Services in the Domestic Public Point-to-Point Microwave Radio Service and Proposed Amendments to Parts 21, 43, and 61 of the Commission's Rules,* 29 FCC2d 870 (1971). "The purpose of this proceeding is to resolve certain threshold policy and procedural issues before we process the applications and opposition pleadings on their individual merits." 29 FCC2d at 878. Although the Commission addressed five questions in total, only two are pertinent to the conduct at issue in this case: whether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field [Question A] and if so, the appropriate means for local distribution of these specialized communications services [Question E]. 29 FCC2d at 878. After a thorough analysis of the growing need for private line data and communications services and the significant potential benefits of competition in this field, the Commission concluded on Question A that the entry of new carriers

---

**22.** In requesting these services, MCI may also have been attempting to become a competitor.

into the specialized communications field and the "full and fair competition" between the new and old carriers in this field would serve the public interest and convenience. 29 FCC2d at 920. As to Question E, the Commission asserted that the new carriers should have the option of providing local service either by interconnection with the major carriers or by construction of their own local facilities. 29 FCC2d at 940. Because of an inadequate record on the radio frequencies these new facilities might use, the Commission ordered further proceedings on the alternative of local construction, 29 FCC2d at 941, but as to the interconnection alternative, the Commission was able to render a final decision.[23] Although in MCI's application for a construction permit, AT&T had refused to interconnect voluntarily its local facilities to MCI's intercity network, AT&T apparently recanted in the rulemaking proceeding with this statement: " 'When the Commission determines that it is in the public interest to license additional intercity common carriers, we would be willing to discuss with them the technical arrangements required and appropriate charges for any connections required of the telephone companies.' " 29 FCC2d at 939. The Commission then stated: "In view of the representations of AT&T and GT&E in this proceeding, upon which we rely, . . . there appears to be no need to say more on this question [ordering specific local interconnection] at this time." 29 FCC2d at 940. Thus, the Commission left the details of interconnection to the voluntary agreement of the parties, subject to this firm policy:

Established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers . . . . Moreover, . . . "where a carrier has monopoly control over essential facilities we will not condone any policy or practice whereby such carrier would discriminate in favor of an affiliated carrier or show favoritism among competitors."

29 FCC2d at 940. Presumably as a result of this decision, AT&T and MCI began negotiating for interconnection services. *Bell Tel. Co. of Pennsylvania v. FCC,* 503 F.2d 1250, 1256 (3d Cir. 1974). In the summer of 1973, AT&T broke off negotiations, submitted tariffs to the state utility commissions, and refused to provide the CCSA and FX service interconnections until the state tariffs were approved. A proceeding before the Commission was initiated to resolve whether the CCSA and FX service interconnections were within the intended scope of the Commission's 1971 policy. *In the Matters of Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers,* 46 FCC2d 413 (1974), aff'd *Bell Tel. Co. of Pennsylvania v. FCC,* 503 F.2d 1250 (3d Cir. 1974). In its opinion, the Commission discussed the clear implications of its 1971 decision:

While FX and CCSA are not specifically mentioned in the *Specialized Common Carrier Services* decision, this is because we were concerned with private line services generally and did not specifically focus on interconnection for FX and CCSA services or any others. It should be noted that the Commission considered the possibility of the "total diversion" of Bell's

---

**23.** AT&T has argued that the FCC did not enunciate a final policy on interconnection but rather contemplated close supervision over AT&T's interconnection practices. For example, AT&T cites the FCC's statement that " 'the results of any authorizations would be the object of close and continuous supervision by the Commission.' " 29 FCC2d at 887. Read in context, however, this statement merely affirms the Commission's resolve to scrutinize the impact of the new entrants upon AT&T's ability to continue providing adequate telephone service to the public rather than to scrutinize the impact of AT&T's interconnection policy upon the new entrants. A second example is the FCC's statement that "we will examine very critically any future opposition by the pending applicants to proposed new entry by others." 29 FCC2d at 920. Of course, this scrutiny is directed at the new entrants' opposition in a Section 214 proceeding to further new entrants and does not focus in the least on AT&T's interconnection policies. It is merely a warning to the specialized common carriers, like MCI, that having benefited from competitive entry, they should not reverse their position and seek to limit the competitive entry of others.

private line revenues, . . .. We would not have discussed this remote possibility . . . if the competition offered by the specialized carriers were not to include FX and CCSA services.

46 FCC2d at 425. The intent of that decision could be understood not only from the scope of the economic impact upon AT&T's private line services which had been considered but, more importantly, from the fundamental policy enunciated therein:

Moreover, the interpretation which Bell would place on our previous rulings would be inconsistent with the basic purposes and objectives of the action which we took in the public interest. In each of the proceedings discussed above, our action was taken to insure that competition in the provision of interstate private line communications services would be on a full, fair and non-discriminatory basis and that the specialized common carriers would not be excluded from that market by reason of the monopoly control by Bell . . . over local distribution facilities. Bell presently has arrangements with its Long Lines Department and with numerous independent telephone companies for access to its local distribution facilities for the purpose of enabling Long Lines and the independent telephone companies to provide FX and CCSA services, and the income derived from these types of services represents a very substantial proportion of the carrier's income from private line services. If MCI and other specialized carriers are excluded from this market, they will be at a definite disadvantage in obtaining and holding subscribers to any of their private line services . . .. Thus, if Bell's contentions are accepted, Long Lines . . . will be in a position to exclude MCI and other specialized carriers . . . not by reason of their superiority, but because of the telephone companies' control over the local distribution facilities. However, we have held . . . that the public interest will be served by competition on a fair and non-discriminatory basis.

46 FCC2d at 426. On the basis of this reasoning, the Commission held "that our prior orders covered interconnection for the broad range of services which the specialized carriers are authorized to provide and Bell has been directed to furnish interconnection facilities . . . to provide all such services, including FX and CCSA services." 46 FCC2d at 426–27.[24] Again the FCC left the details of interconnection to negotiations between AT&T and MCI, observing that, "if a good faith effort is made," arrangements like those AT&T had with independent telephone companies could also be agreed upon with the specialized carriers. 46 FCC2d at 429.

Shortly after the conclusion of this proceeding on AT&T's refusals to interconnect, AT&T filed a tariff with the FCC containing its obligations to provide interconnection service and its charges for those services. MCI protested that these charges and services were unreasonable and discriminatory and initiated a proceeding before the FCC. *In the Matter of AT&T,* 47 FCC2d 660 (1974). "However, before these formal procedures had begun, AT&T expressed its desire to work informally with the parties and the Commission with the goal of expeditiously resolving as many of the issues herein as possible." *In the Matter of AT&T,* 52 FCC2d 727, 732 (1975). Through Commission encouragement, the parties were able to reach a settlement agreement providing for AT&T's non-discriminatory treatment of MCI. The Commission explained:

Therefore, we will accept the settlement (without necessarily approving it)

---

**24.** AT&T has cited the FCC's diffident remark in the line following the one which we have just quoted: "However, we recognize that our prior orders may not have been perfectly clear." 46 FCC2d at 427. On appeal, however, the Third Circuit did not find such diffidence necessary: "Nevertheless, . . . we are convinced that the Commission's decision in Docket 18920 includes a direction to the established carriers to provide FX and CCSA to the specialized carriers on a non-discriminatory basis." *Bell Tel. Co. of Pennsylvania v. FCC,* 503 F.2d 1250, 1259 (3d Cir. 1974).

as a disposition . . . of Docket No. 20099 [the proceeding initiated by MCI] . . . and we will therefore terminate . . . the proceedings in Docket No. 20099. We wish to emphasize that our action herein should not be interpreted as modifying or derogating in any way the obligations imposed upon AT&T and the Associated Bell System companies by earlier decisions . . . .

We will expect all parties to the Settlement Agreement not only to comply with its terms but also to adhere to its spirit.

52 FCC2d 732–33 (explanation supplied in brackets). Although providing a forum for dispute resolution, the FCC again expressed its preference for voluntary agreement between the parties:

We endorse the proposal to conduct, as necessary, meetings of the parties under the aegis of the Commission's Common Carrier Bureau. . . . It is our hope that, through these meetings, the parties will be able to resolve any differences which may arise. However, we wish to make clear that no one is precluded from bringing to the Commission's attention any matter which it believes requires Commission action.

52 FCC2d at 733.

Shortly thereafter, AT&T included in a tariff one of the interconnection restrictions upon which it had insisted throughout the post-1971 negotiations.[25] As part of its tariff, AT&T stated that it would not interconnect at any location except a customer's premises. The Commission found this interconnection restriction unlawful for two reasons. "The above-described Tariff 260 general interconnection restrictions are inconsistent with principles and policies established in *Specialized Common Carrier Services, Bell System Tariff Offerings, Hush-a-Phone,* and *Carterfone* . . . . These decisions clearly have established that AT&T is duty bound to honor reasonable requests for the interconnection of AT&T facilities with specialized carrier facilities." *In the Matter of AT&T,* 60 FCC2d 939, 942–43 (1976). In addition, since AT&T was providing the desired interconnection to some other carriers, "the foregoing Tariff 260 restrictions also raise a question of unlawful discrimination . . . . The discriminatory treatment has not been justified. In fact, AT&T has not even attempted to justify the discrimination." 60 FCC2d at 944–45. Thus, in this decision, the Commission once again reiterated its firm and consistent policy to prohibit refusals of or restrictions on interconnection.

We think that this short regulatory history demonstrates that AT&T's alleged refusals to interconnect, interconnection on discriminatory terms, and delays and harassment during interconnection should not be impliedly immunized from the operation of the antitrust laws. The FCC has never authorized, approved, or sanctioned this conduct.[26] Nor has the FCC

---

25. In a later section, we will discuss the implications of these restrictions being embodied in a tariff. At this point, however, we are considering the decision merely as illustrating the Commission's consistent position on refusals to interconnect.

26. AT&T has cited a number of cases which purportedly confer immunity for interconnection practices. In most of these cases, the regulatory agency either expressly approved or clearly sanctioned the anticompetitive conduct at issue. *Business Aides, Inc. v. Chesapeake & Potomac Tel. Co. of Va.,* 480 F.2d 754 (4th Cir. 1973) (antitrust immunity granted for refusal to provide concentrator-identifier equipment when the basis for refusal was a tariff expressly approved by the state utilities commission and thus the result of the "considered judgment of the state regulatory authority"); *Lamb En-* terprises, Inc. v. Toledo Blade Co., 461 F.2d 506 (6th Cir. 1972) (antitrust immunity granted a defendant who insisted upon plaintiff satisfying the requirements embodied in a tariff which had been expressly approved by the state utility commission); *Jeffrey v. Southwestern Bell,* 518 F.2d 1129 (5th Cir. 1975) (immunity conferred on imposition of rate which was approved by a municipality after a thorough hearing and which was therefore the result of the municipality's considered judgment); *Seatrain Lines, Inc. v. Pennsylvania R. Co.,* 207 F.2d 255 (3d Cir.), *cert. denied,* 345 U.S. 916, 73 S.Ct. 727, 97 L.Ed. 1350 (1953) (antitrust immunity granted for a car interchange agreement, the modification of which would interfere with an agreement that had expressly been approved by the ICC); *Essential Communication Systems, Inc. v. American Tel. & Tel. Co.,* 446 F.Supp. 1090 (D.N.J.1978) (antitrust immunity

supervised AT&T's interconnection practices so closely that the FCC's approval granted for tariffs requiring use of telephone company's connecting equipment when FCC sanctioned the tariff requirement as an interim measure until the FCC could establish an equipment registration program by formal rulemaking); *Monitor Business Machines, Inc. v. American Tel. & Tel. Co.,* 1978–1 Trade Cas. ¶ 62,030 (C.D.Cal. May 5, 1978) (same); *Western Electric Co. v. Milgo Electronic Corp.,* 450 F.Supp. 835 (S.D.Fla.), *appeal dismissed* 568 F.2d 1203 (5th Cir. 1978) (immunity conferred on refusal to interconnect because of plaintiff's failure to satisfy a registration requirement embodied in a tariff expressly approved by the FCC). There are two of AT&T's cases which found the FCC had primary rather than exclusive jurisdiction over these practices. *Western Electric Co. v. Milgo Electronic Corp., supra; Citizens Utilities Co. v. American Tel. & Tel. Co.,* 1978–1 Trade Cas. ¶ 61,959 (N.D.Cal.1977) (FCC has primary jurisdiction over division of interchanged rates whose tariff had not yet been either approved or disapproved). Of AT&T's cases, there are two which apparently have found immunity in the absence of regulatory approval or sanction. *Phontele, Inc. v. American Tel. & Tel. Co.,* 435 F.Supp. 207 (C.D. Cal.1977); *Dasa Corp. v. General Tel. Co. of California,* 1977–2 Trade Cas. ¶ 61,610 (C.D. Cal.1977). To the extent that is their holding, we disagree with those cases and prefer to follow the cases which fail to find a clear repugnancy in the absence of agency approval or sanction. *Jarvis, Inc. v. American Tel. & Tel. Co.,* Civil Action No. 74–1674 (D.D.C. Aug. 7, 1978); *International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.,* 449 F.Supp. 1158 (D.Haw. 1978); *Chastain v. American Tel. & Tel. Co.,* 401 F.Supp. 151 (D.D.C.1975); *Macom Products Corp. v. American Tel. & Tel. Co.,* 359 F.Supp. 973 (C.D.Cal.1973).

27. In *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), the Supreme Court held that a provision of the Securities Exchange Act of 1934 permitting the Commission to approve or disapprove of commission rates conferred an implied antitrust immunity upon the fixed commission rates adopted by defendants. The Court based this holding on two grounds. First, the Court found a demonstrable Congressional intent to leave the recognized anticompetitive practice of fixing commission rates to exchange self-regulation until the Securities and Exchange Commission affirmatively prescribed a different manner of determining commission rates. 422 U.S. at 667, 95 S.Ct. 2598. Second, the Court observed that the Commission had so closely scrutinized and supervised the Exchange's commission rate practices as to have in effect formally approved them. 422 U.S. at 689 & n.13, 95 S.Ct. 2598. This regulatory supervision included a 1958 study of Exchange rates could be inferred.[27] Rather, from the *Specialized Common Carriers Decision* forward, which resulted in an agreement to reduce commission rates, a six volume study completed in 1963, a 1968 proposed rulemaking which would have eliminated fixed rates on orders in excess of $50,000.00, a phase-out of fixed rates for orders over $500,000.00, $300,000.00, and $100,000.00, and eventually the complete elimination of fixed commission rates on all orders. 422 U.S. at 668–676, 95 S.Ct. 2598.

There are several significant differences between *Gordon* and this case. First, there is no demonstrable Congressional intent which authorizes AT&T, acting as a self-regulator, to adopt interconnection or any other practices which attempt to maintain AT&T's monopoly position. Second, the FCC has not exercised extensive regulatory supervision over AT&T's interconnection practices since 1971 but has preferred voluntary negotiation between the parties. Third and perhaps most important, what supervision the FCC has undertaken since 1971 was intended to enforce its pro-competitive *Specialized Common Carriers'* policy against AT&T rather than to approve the regulated industry's clearly anticompetitive practices as an interim measure until an agency policy could be formulated. *See generally, Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1297–98 (5th Cir. 1971) (distinguishing policy making from policy enforcement).

Demonstrable legislative intent is the touchstone of a second decision upon which AT&T relies. *United States v. National Ass'n. of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2598 (1975). In *NASD,* the Court found that Congress had been aware of the disruptive price competition in the "bootleg market" for mutual fund shares and had approved the resale price maintenance agreements in the absence of express SEC disapproval. In the Communications Act, on the other hand, Congress did not clearly confer on AT&T monopoly power over a fast-developing new field such as private line data communications. Furthermore, in light of the FCC's pro-competitive rulings in this field, it cannot be said that the immunization of AT&T's alleged attempt to maintain its monopoly power in private line communication is necessary to make the Communications Act work.

Basically, AT&T has failed to cite any evidence of a Congressional intent to permit maintenance of AT&T's monopoly power through restrictive interconnection practices. In its reply brief, AT&T also asserts that "regulatory policy is . . . irrelevant." (Reply, p. 7). This statement is somewhat baffling, given AT&T's heavy reliance on *Gordon,* but it does help explain AT&T's position. Fundamentally, that position is that antitrust immunity should be implied not because of Congressional intent or the discrete policy requirements of the regu-

the FCC has adhered to a firm policy which strongly disapproves of common carriers' refusals to interconnect with specialized carriers, 503 F.2d at 1250, and which clearly and strongly disapproves of the provision of interconnection to specialized common carriers on discriminatory terms. 29 FCC2d at 940. On each occasion where the FCC has reached the merits of one of AT&T's interconnection practices, the FCC has found the practice unlawful. 46 FCC2d 413 (1974) (refusals to interconnect with FX and CCSA); 60 FCC2d 939 (1976) (restrict interconnection to customer's premises). Thus, AT&T's interconnection practices have either been expressly disapproved by the FCC or are clearly contrary to enunciated FCC policy. When, as in this case, the conduct at issue is contrary to regulatory goals, imposition of antitrust liability for such conduct does not conflict with the regulatory regime and thus the basis for implying antitrust immunity disappears. *Mt. Hood Stages, Inc. v. Greyhound Corp.,* 555 F.2d 687 (9th Cir. 1977), *rev'd on other grounds,* 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978). There is simply no need to immunize these practices in order to make the Communications Act work as Congress or the FCC intends.

 Not only is there no plain repugnancy between the Communications Act and the antitrust laws with regard to AT&T's refusals to interconnect or its discrimination and harassment in interconnec-

tion, but the two acts appear to supplement and accommodate one another in this instance. The policy of the *Specialized Common Carrier Decision,* as announced by the FCC, is to achieve "full and fair competition in the specialized field among all carriers, both established and new." [28] As the Commission recognized and the Department of Justice emphasized, this policy "would also be consistent with the policy embodied in the antitrust laws." 29 FCC2d at 893. Thus, in providing the interconnections which permit new entry and in providing them in a non-discriminatory manner which insures full and fair competition, the Communications Act and the antitrust laws are acting in harmony rather than in plain conflict.[29]

 The two principles which underly many of the Supreme Court decisions on implied immunity also support this conclusion. According to the first principle, an immunity may be implied when imposition of antitrust liability would subject the defendant to conflicting standards. As we have just concluded, the FCC's policy and decisions in the area of interconnection are consistent with the antitrust laws. Thus, imposition of antitrust liability will not subject AT&T to conflicting standards of conduct. According to the second principle, antitrust liability may be imposed on a defendant's conduct when that conduct is the product of independent business judgment rather than regulatory coercion. Until the

latory agency but simply because the statute gives the FCC jurisdiction over AT&T's activities. This ignores the clear Supreme Court position that, "The Court has never held, and does not hold today, that the antitrust laws are inapplicable to anticompetitive conduct simply because a federal agency has jurisdiction over the activities of one or more defendants." Gordon v. New York Stock Exchange, 422 U.S. 659, 692, 95 S.Ct. 2598, 2616, 45 L.Ed.2d 463 (1975) (Stewart, J., concurring).

**28.** The Commission recognized that the establishment of competition in the sector of private line communications would affect general rate-making principles which were the subject of an ongoing proceeding, but the Commission explicitly refused to delay the initiation of the new private line services and its interconnec-

tion orders until those principles were established. 29 FCC2d at 916–17.

**29.** AT&T quotes from a decision in which the Commission states that "the terms, conditions and charges for the private line interstate and foreign communications of the specialized common carriers . . . are within the exclusive jurisdiction of the Commission." *Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers,* 46 FCC2d 413, 417 (1974). Apparently, AT&T intends to leave the impression that the Commission was holding its jurisdiction exclusive of an antitrust court on interconnection practices. Actually, the Commission was merely affirming the longstanding principle that, as to interstate and foreign communications, its jurisdiction is exclusive of state regulatory commissions.

Commission's 1971 policy decision, AT&T's decision whether to interconnect was purely voluntary, a matter of independent business judgment. *Woodlands Tel. Corp. v. American Tel. & Tel. Co.*, 447 F.Supp. 1261, 1265 (S.D.Tex.1978). In the 1971 decision itself and throughout the subsequent proceedings, the FCC strove quite hard to leave interconnection practices to voluntary negotiation between AT&T and MCI. For example, relying upon AT&T's assurances of cooperation, the FCC in 1971 permitted interconnection to be accomplished by negotiation. 29 FCC2d at 940. Apparently preferring negotiation, AT&T did not file a tariff on these interconnection services. Thus, AT&T refusals to provide various interconnection services or its imposition of discriminatory interconnection during the next two years was purely a matter of its own independent business judgment. Again, after finding unlawful AT&T's tariff which refused to provide FX and CCSA service, the FCC left the details of local interconnection to "good faith" negotiation between the parties. Consequently, any further refusal to interconnect or imposition of discriminatory terms would also be the product of AT&T's independent business judgment. Thus, for the better part of four years, AT&T's interconnection practices were the product of its independent business judgment. If, in exercising this independent business judgment, AT&T engaged in conduct which demonstrates an intent to maintain its monopoly in the private line communications market, then the antitrust laws should apply. We therefore conclude that, on the basis of the principles and reasoning found in Supreme Court cases, antitrust liability may be premised on AT&T's interconnection practices.

## TARIFF FILINGS

Beside the state tariffs complained of in paragraph 23(1), MCI has claimed that two types of tariffs filed with the FCC have also been part of AT&T's alleged scheme of monopolization.[30] As we saw in the preceding section, AT&T filed late in 1974 the allegedly discriminatory interconnection tariffs which became the subject of the settlement agreement, and subsequent to the settlement, AT&T filed Tariff 260 which restricted interconnection to the premises of a customer. These tariffs, which, contrary to announced FCC policy, either restrict or discriminate in interconnection, are the first type which are alleged to comprise the scheme. The second are competitive tariffs filed or caused to be filed by AT&T. According to the complaint, AT&T caused Western Union to file a "mirror" tariff, covering the Chicago-St. Louis route, at the precise time MCI was inaugurating its service but well before Western Union could offer the service. (Complaint, par. 23(g)). AT&T also filed its own tariff covering the Chicago-St. Louis route. This "experimental" tariff provided for charges which were substantially lower than MCI's, but at a time when AT&T was unable to provide the services scheduled. (Complaint, par. 23(j)). Both tariffs were accompanied by extensive publicity to the business and financial community and were allegedly intended to discourage MCI's potential customers and to deprecate MCI's credit in the financial community.[31]

30. Throughout the briefs, both parties have assumed that the TELPAK tariff is in issue. From what we are able to discern, plaintiffs are complaining not so much about the rate itself but rather about AT&T's refusal of interconnections to MCI which were offered by TELPAK and AT&T's allegedly discriminatory restrictions on MCI's resale of TELPAK services. We believe these matters have been covered in the previous section. In any event, the TELPAK tariff is another of the competitive tariffs which the FCC has specifically found unlawful. *In the Matter of AT&T, Long Lines Department*, 61 FCC2d 587 (1976) (failure to show competitive necessity and failure to show rate was compensatory).

31. AT&T argues that the conduct complained of in these paragraphs is merely the "preannouncement" of rate and service offerings, an activity required by Section 203(b) of the Act. Drawing all inferences most favorable to the plaintiff, however, we believe that the allegations complain of preannouncing in bad faith a "sham" tariff which the carrier was unable to perform. Certainly, the Communications Act was not intended to and does not protect such allegedly "bad faith" preannouncements.

We believe that these allegations of sham activity fall within the doctrine of *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In its classic formulation, sham litigation consists of the repeated institution of baseless court or agency proceedings through which the defendants seek to foreclose the plaintiffs' access to these tribunals and thereby injure or destroy the plaintiff as a competitor. The alleged use of FCC tariff filings in our case, though not within the precise pattern of *California Motor*, does present abuses of the regulatory process from which an anticompetitive intent may be inferred. The interconnection tariffs present a situation which is the converse of *California Motor*. In that case, the defendant injured his competitor by dogged resistance and opposition, whereas in filing allegedly sham interconnection tariffs, AT&T is allegedly injuring MCI by initiating proceedings to which MCI must respond. Until MCI obtains a declaration from the FCC that the interconnection tariffs are unlawful, MCI must suffer the restrictions upon its ability to offer a full range of services which, in the Commission's words, deny "full and fair competition," and in obtaining the Commission's declaration, MCI must incur litigation expenses which could financially exhaust MCI. (Complaint, par. 23(1)); *B.A.M. Liquors, Inc. v. Satenstein*, 1976–2 Trade Cas. ¶ 60,-997 (S.D.N.Y.). Whether used offensively or defensively, such sham activity states a claim of antitrust violation. *United States v. Otter Tail Power Co.*, 360 F.Supp. 451 (D.Minn.1973), *aff'd without opinion*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). The competitive tariffs operate somewhat differently. Like all shams, the competitive tariffs seek something other than a genuine adjudication. *Associated Radio Serv. Co. v. Page Airways, Inc.*, 414 F.Supp. 1088 (N.D.Texas 1976); *United States Dental Institute v. American Ass'n. of Orthodontists*, 396 F.Supp. 565 (N.D.Ill. 1975). According to the allegations, what AT&T really sought, in the filing of these tariffs, was to strategically publicize services AT&T was unable to provide and thereby to discourage potential customers from immediately subscribing to services MCI was then prepared to provide.[32] Allegedly, these tariff filings were strategically timed to coincide with and thereby impede MCI's public financing. (Complaint, par. 23). Unlike the sham interconnection tariffs which seek to exhaust a competitor's finances, these competitive tariffs merely seek to use the tariff filing as a basis for misleading publicity to customers and the financial community. As such, they fall within the category of sham activity "timed and designed principally . . . to preserve [its] monopoly." *United States v. Otter Tail Power Co.*, 360 F.Supp. 451–52 (D.Minn.1973), *aff'd without opinion*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). Thus, reading these allegations about the interconnection and competitive tariffs in the light most favorable to plaintiffs, as we must on a motion to dismiss, we believe the plaintiffs have alleged the sort of sham activity which falls within the doctrine of *California Motor* and its progeny.[33]

AT&T argues that the FCC's pervasive regulation of the services and charges contained in its tariffs should immunize AT&T from the antitrust laws beginning the day the tariff is filed. We disagree for two independently sufficient reasons. First, AT&T filed tariffs with the

**32.** Since these allegations about the competitive tariffs may also be regarded as showing a specie of false or deceptive advertising, our earlier comments about false advertising would apply.

**33.** AT&T asserts that the FCC authorized the filing of competitive tariffs before a carrier was able to provide those services. The complaint may be read to allege that the carriers would be unable to provide those services within a reasonable time and that the filing was therefore made for the bad faith purpose of generating misleading publicity. The FCC's authorization does not appear to extend to such bad faith filings.

FCC which are allegedly sham, and even the most pervasive scheme of regulation cannot immunize someone from anticompetitive sham activity which seeks to abuse the regulatory process itself. Second, the principles developed in the preceding section suggest that immunity should be implied not at the time of tariff filing [34], but only after the agency has approved or otherwise affirmatively sanctioned the contents of the tariff. Under the Communications Act, the communications carrier has sole responsibility for filing a tariff. 47 U.S.C. § 203(a). As the Supreme Court has stated with respect to the model for the Communications Act, "The Act was designed to preserve private initiative in rate-making as indicated by the duty of each common carrier to initiate its own rates." *Georgia v. Pennsylvania R. R. Co.*, 324 U.S. 439, 459, 65 S.Ct. 716, 727, 89 L.Ed. 1051 (1945) (citations omitted). As a result, the contents of the tariff are in the first instance the product of the carrier's independent business judgment. In the tariff schedule, the carrier must designate an effective date. 47 U.S.C. § 203(a). Unless otherwise acted upon, the tariff becomes effective no later than ninety days after its filing. *Compare* 47 U.S.C.A. § 203(b)(1) (Supp.1978) (ninety days) *with* 47 U.S.C. § 203(b)(1) (1970) (thirty days). Upon complaint or its own motion, the Commission may initiate a hearing on the lawfulness of the tariff and may suspend the tariff for five months beyond its effective date. *Compare* 47 U.S.C.A. § 204(a) (Supp.1978) (five months) *with* 47 U.S.C. § 204(a) (1970) (three months). If the Commission has not concluded the hearing within the five-month period of suspension, the tariff becomes effective as law and binds carrier and customer alike. 47 U.S.C. § 204(a). These provisions for automatic

effectiveness upon the expiration of a specified time are designed to protect a common carrier from an excessive regulatory lag between the time cost increases are incurred and the time those costs may be recovered in an increased rate. H.R. No. 1315, 94th Cong., 2d Sess. 20, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 1926, 1941. In practice, however, a bulky or complex tariff could become effective well before the Commission had either approved or disapproved its contents. H.R. No. 1315, 94th Cong., 2d Sess. 4, 13–14, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 1926, 1928, 1934–35. Since the carrier voluntarily initiates the tariff, its contents are the product of the carrier's independent business judgment until the conclusion of the Commission's hearing. *See generally*, Hearings before the Committee on Interstate Commerce on S. 2410, A Bill to Provide for the Regulation of Interstate and Foreign Communications by Wire or Radio, and for Other Purposes, Senate Hearings on S. 2410, 73rd Cong., 2d Sess. 76, 80, 83 (1934) (Testimony of Walter S. Gifford). If the intent of the carrier's business judgment is to monopolize or unreasonably restrain trade and that intent is revealed in the tariffs, the antitrust laws should apply to those tariffs. *Litton Systems, Inc. v. Southwestern Bell Tel. Co.*, 539 F.2d 418 (5th Cir. 1976). *See generally, Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Georgia v. Pennsylvania R. R. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).[35]

Once the FCC approves or affirmatively sanctions the tariff, however, the conduct required by the tariff is no longer a mere matter of the carrier's business judg-

---

**34.** Again, the cases cited by AT&T may be distinguished because the regulatory agency actually approved the allegedly anticompetitive telephone rate. *E. g., Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir. 1975); *see also*, note 26 *supra*.

**35.** Tariffing is a unique activity by which the results of private initiative are transformed into public law due to the passage of time. If, as a result of this private initiative, a customer sustains injury, the Communications Act provides either a damages or refund remedy. If, as a result of this same initiative, a competitor sustains injury, logically the Sherman Act should furnish the remedy.

ment but also becomes a matter of regulatory policy.[36] If the approved conduct is anticompetitive, then the regulatory and antitrust regimes may so plainly conflict that an antitrust immunity should be implied. The record of FCC proceedings before us, however, does not demonstrate that either the interconnection or competitive tariffs were approved by the Commission. As we stated in the previous section, the tariff restrictions on interconnection about which MCI complains were either expressly disapproved by the FCC or were contrary to firm Commission policy. The same is true of the competitive tariffs. Although the Commission's *Specialized Common Carrier Decision* left open the possibility that AT&T might respond to competition in private line communications with non-uniform rates, AT&T's Hi-Lo tariff, apparently the one to which MCI objects in paragraph 23(j), was declared unlawful by the FCC as an unjustified discriminatory rate. *In the Matter of AT&T, Charges, Regulations, Classifications, and Practices for Voice Grade/Private Line Service (High Density-Low Density)*, 58 FCC2d 36 (1976). Due to the filing of AT&T's tariff, proceedings on the Western Union tariff were either combined with the Hi-Lo tariff proceedings or were dismissed as moot. *Western Union Tel. Co.*, 49 FCC2d 133 (1974). In both cases, the FCC expressly disapproved the tariffs or rendered no decision on them. Clearly, these FCC proceedings do not demonstrate that the FCC somehow sanctioned these tariffs as measures which were necessary to make the Communications Act work. Thus, even if the tariffs were not sham, the record before us does not demonstrate sufficient Commission approval or sanction of the tariffs to create a plain repugnancy between the Communications Act and the antitrust laws.

## MISCELLANEOUS PRACTICES

■ As one of the numerous acts comprising this scheme, MCI alleges that AT&T expanded its business and data communications circuits at an unprecedented rate following MCI's application before the FCC for a construction permit. (Complaint, par. 23(i)). AT&T rejoins that the Commission has plenary authority under Section 214 to approve the construction of any new line or extension of any old one and that, pursuant to this authority, the FCC has approved AT&T's expansion of private line capacity. *In the Matter of AT&T*, 52 FCC2d 1097 (1975). For at least two reasons, we are unable to dismiss this allegation of the complaint. First, the decision cited by AT&T refers to construction in 1975, but drawing all inferences favorable to the plaintiff, we must assume that MCI is complaining of an expansion which began as early as 1961. On the basis of the record before us, we are unable to conclude that the FCC approved of the alleged expansion. Second, the FCC appears to have concluded that the bulk certification typified in the decision cited by AT&T does not result from any informed approval by the FCC and has in fact led to consequences which the FCC unambiguously disapproves, the overbuilding of AT&T's plant and the underutilization of its plant capacity. *In the Matter of American Telephone and Telegraph Company*, 64 FCC2d 1, 50–53, 106 (1977). For these reasons, therefore, we deny AT&T's motion to dismiss this allegation. *See Litton Systems, Inc. v. Southwestern Bell Telephone Co.*, 539 F.2d 418 (5th Cir. 1976).[37]

---

**36.** The FCC, in its amicus brief before Judge Waddy, supported this position. The FCC urged that there exists exclusive jurisdiction only over those tariffs which are approved or prescribed by the Commission. Memorandum of Federal Communications Commission as Amicus Curiae, pp. 20–21. If the question of implied immunity arises before the Commission has reached a decision on a tariff's legality, a referral to the Commission under the doctrine of primary jurisdiction would be appropriate.

*E. g., Citizens Utilities Co. v. American Tel. & Tel. Corp.*, 1978–1 Trade Cas. ¶ 61,959 (N.D. Cal.1977); *Macom Products Corp. v. American Tel. & Tel. Co.*, 359 F.Supp. 973 (N.D.Cal.1973).

**37.** Even if, on a more complete record, we were to conclude that FCC approval precluded a finding of liability based on AT&T's expansion of capacity, the plaintiffs still might be able to introduce evidence of this expansion on the question of AT&T's intent. *See generally,*

## EXCLUSIVE REMEDY

The Communications Act provides several administrative remedies for discriminatory tariffs. Should a tariff become effective due to the passage of time without an administrative decision, the Commission may order a carrier to keep account of all monies received under the new rate and, if the tariff is eventually found unlawful, the Commission may order refunds of the monies received. 47 U.S.C. § 204. Alternatively, a person who is injured by a discriminatory tariff may sue the carrier, either in an administrative hearing or in district court, for the resulting money damages. 47 U.S.C. §§ 206–207. The Commission also possesses an injunctive power which permits the Commission to order a carrier to cease and desist from following an unlawful tariff. 47 U.S.C. § 205.

■ As an independent ground for dismissal, AT&T argues that these administrative remedies constitute "a complete and self-contained" remedial system which provides the exclusive remedy for MCI's injuries. We are unable to accept this argument for several reasons. First, we do not perceive in the Supreme Court cases cited by AT&T an articulated, independent antitrust immunity based solely on the existence of administrative remedies. The availability of administrative remedies is not sufficient reason, by itself, for finding exclusive FCC jurisdiction; rather, the presence of adequate administrative remedies is only one of several factors necessary to make that finding. *See* Note, *AT&T and the Antitrust Laws: A Strict Test for Implied Immunity*, 85 Yale L.J. 254 (1975). Second, the case upon which AT&T heavily relies arose from an alleged price fixing agreement, a *per se* offense under Section 1. *Terminal Warehouse Co. v. Pennsylvania R. Co.*, 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827 (1936). In that case, the Court expressly exempted from its rules Section 2 monopolies: "One may suppose a business of a manufacturer which has assumed the form and size of a monopoly, or, if not already at that stage, is well upon the road thereto. . . . Whatever liability grows out of that alliance is untouched by this decision." 297 U.S. at 515, 56 S.Ct. at 552 (citations omitted). As we said earlier, the gist of MCI's claim is AT&T's alleged unlawful maintenance of its monopoly power, and thus the teaching of *Terminal Warehouse* does not apply to MCI's claim.

■ These two reasons would be sufficient to reject AT&T's argument, but assuming *arguendo* the existence and potential application of this doctrine, we do not believe its requirements have been satisfied. According to AT&T's formulation of the doctrine, the administrative agency must provide a "complete and self-contained" system of remedies. For several reasons, we are unable to conclude that the FCC's system is adequate, much less complete enough, to remedy MCI's injuries. By its very nature, an FCC tariff proceeding focuses *seriatim* on individual tariffs. As we stated in the section on particular immunities, MCI is complaining of a monopolistic scheme which may become palpable only from a pattern of conduct. Thus, the piecemeal consideration of individual tariffs offered by FCC proceedings may be insufficient to detect the claimed violation. Second, the FCC tariff proceedings primarily seek to redress injuries to a carrier's customer rather than injuries to a carrier's competitor.[38] Although, by virtue of AT&T's monopoly over local telephone lines, MCI is a customer of AT&T's local services, the primary injury for which MCI seeks relief is one to its competitive position. As the D.C. Circuit has remarked, "If the Commission ultimately determines that Bell's MTS rates are too high and the private line rates too low, MTS users will

---

*United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 n.3, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

**38.** The legislative history of the Communications Act does not reveal an intent that the FCC be the exclusive repository of remedies for competitive injury. *See* pp. 1086–1089, *supra*.

receive a refund, but AT&T's competitors will not be compensated for loss of business." *Nader v. FCC,* 172 U.S.App.D.C. 1, 24, 520 F.2d 182, 206 (D.C.Cir. 1975). *See also,* Senate Hearings on S. 2410, 73rd Cong., 2d Sess. 104 (1934); *MCI Telecommunications Corp. v. FCC,* 182 U.S.App.D.C. 367, 377 n.46, 561 F.2d 365, 375 n.46 (D.C. Cir. 1977).[39] Third, in individualized instances, the FCC proceeding may be inadequate even to redress customers' injuries. For example, due to the tremendous expansion in size and complexity of the communications industry, FCC tariff proceedings have encountered substantial delays. H.R. No. 1375, 94th Cong., 2d Sess. 11, 13–14, *reprinted in* 1976 U.S.Code Cong. & Admin. News, pp. 1933, 1935 (cited as H.R. No. 1315 and page). These delays have meant that the FCC is often unable to render a decision on the legality of a tariff before the suspen-

sion period expires, and thus an illegal tariff may be imposed on customers for a significant period of time. H.R. No. 1315, pp. 4, 14. In certain instances, the remedies of an accounting order or money damages may be inadequate to compensate the injuries suffered by a customer subject to such an illegal tariff. In fact, Congress has expressly recognized that "the accounting and refund provisions, being applicable only in rate increase situations, afford no protection or remedy against new or reduced rates which are ultimately found to be unlawful," such as those embodied in AT&T's Hi-Lo tariff. H.R. No. 1315, pp. 4, 14, 15–16, U.S.Code Cong. & Admin.News 1976, pp. 1928, 1935, 1936–1937.[40] Thus, as Judge Greene has commented in a similar context, "Additionally, it is not insignificant that, even with respect to that portion of defendants' activities which the Commission does

**39.** AT&T has quoted the following passage in support of its contention that the FCC is equipped to remedy antitrust injury: "The Commission retains a duty of continual supervision of the development of the system as a whole, and this includes being on the lookout for possible anticompetitive effects." *National Ass'n. of Regulatory Utility Commissioners v. FCC,* 173 U.S.App.D.C. 413, 421, 525 F.2d 630, 638, *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). Read in context, this statement does no more than affirm the well-established principle that the FCC may consider the effect on competition as one factor in determining the public interest. The D.C. Circuit recognized, however, that predatory conduct would be remediable under the antitrust laws: "[T]his action does nothing except attempt to make financially impossible with AT&T capital predatory behavior which is already illegal and subject to prosecution under the antitrust laws." *Id.* 173 U.S.App.D.C. at 181, 525 F.2d at 637–38.

The Commission's inability to remedy MCI's competitive injury is well illustrated by the outcome of the proceedings on one of the allegedly "sham" tariffs. In 1973, Western Union filed its "mirror" tariff, and MCI initiated a complaint against this tariff. Shortly thereafter, AT&T filed its Hi-Lo tariff. In apparent response, Western Union withdrew its mirror tariff and filed a Hi-Lo tariff of its own. The FCC dismissed MCI's complaint as moot. In the *Matter of Western Union Telegraph Co.,* 49 FCC2d 133 (1974). Thus, any loss of customers MCI might have suffered as a result of this

allegedly "sham" tariff was not remedied by the Commission.

**40.** Congress acknowledged that in this situation the FCC was unable to remedy the injury suffered by AT&T's competitors. H.R. No. 1315, pp. 20–21. AT&T's Hi-Lo tariff is also an instructive example of how the FCC was unable to remedy even the customers' injuries. In 1975, AT&T filed a tariff which offered a low rate on high density routes and a higher rate on low density routes. Coincidentally, AT&T experienced some competition on the former but maintained FCC sponsored monopoly control on the latter. Since MCI's transmissions covered high density routes, MCI claimed that AT&T's lower rate did not recoup its actual costs and was subsidized by the higher rate charged on its monopoly routes. After two hearings, the FCC found that AT&T had not justified the clearly discriminatory terms of the Hi-Lo tariff. Although the FCC had originally ordered AT&T to keep account, the FCC did not order a refund. Its reasoning was as follows: The Commission does not have the authority to order the high density users to pay more than the original rate. Many of AT&T's customers use both high and low density routes. Thus, if the Commission only ordered AT&T to refund overcharges on low density routes to these customers without also ordering these customers to pay for their undercharges, these customers would receive a windfall. Rather than sanction such unwarranted gain, the FCC preferred to deny all refunds.

regulate, only the courts can grant complete relief. . . . Congress could hardly be deemed by implication to have conferred immunity on carriers such as these defendants when the effect of its assumed action would be to insulate the alleged antitrust violators from effective sanctions or relief." *United States v. American Tel. & Tel.,* 461 F.Supp. at 1328 n.43 (D.D.C. 1978). Thus, for all of these reasons, we must reject AT&T's contention that the FCC provides the exclusive scheme for remedying MCI's alleged injuries.

## SHAM ACTIVITIES

Plaintiffs have alleged that, as part of its monopolization scheme, AT&T has filed sham tariffs with various state regulatory agencies, (Complaint, par. 23(c)(i)(1)), and initiated a massive publicity campaign which was designed to reach the public, potential customers, regulators, and Congressmen and which misrepresented the effect of private line competition on the national telephone network and disparaged MCI's capabilities. (Complaint, par. 23(m)). Allegedly, AT&T engaged in these sham activities in bad faith and with the intent of interfering directly with MCI's business relationships. (Complaint, par. 23(c)(5), (1)).[41] AT&T has moved to dismiss these allegations on both procedural and substantive grounds.

For the procedural ground, AT&T relies on *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076 (9th Cir. 1976), *cert. denied* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977), in which the Ninth Circuit held that to state a claim under the "sham exception" of *California Motor,* a litigant must allege specifically the defendant's particular "sham" activities. We believe that MCI's allegations of sham activities are more than sufficient to satisfy the requirements of Rule 8(a). The detail with which MCI has identified the sham state tariffs and the deceptive publicity campaign is not in the least conclusory and is certainly adequate to put defendant on notice of the nature of MCI's claims. Insofar as *Franchise Realty* imposes a greater burden of pleading particularity on a litigant alleging "sham" activities than does Rule 8, we must respectfully disagree with the Ninth Circuit's conclusion and observe that at present this strict rule of pleading is not the law in this Circuit.

On the merits, AT&T argues that the filing of sham tariffs and the initiation of a massive, deceptive publicity campaign is the type of conduct which falls within the *Noerr* immunity. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), a group of trucking companies charged that a group of railroads and a public relations firm had initiated a deceptive publicity campaign designed to foster enactment of laws harmful to the truckers and to impair the business relationship between the truckers and their customers. 365 U.S. at 129–30, 81 S.Ct. 523. Following a trial in which the plaintiffs' evidence consisted primarily of the vicious and deceptive techniques employed in the publicity campaign, the trial court found that the railroad's campaign was solely intended to injure the truckers as competitors and that the railroads had therefore violated the Sherman Act. On review in the Supreme Court, the Court observed: "[A]ll of the evidence in the record . . . deals with the railroads' efforts to influence the passage and enforcement of laws. . . . In the light of this, the findings of the District Court that the railroads' campaign was intended to and did in fact injure the truckers in their relationships with the public and with their customers can mean no more than that the truckers sustained some

---

**41.** Although MCI does not specifically allege this intent in the paragraph on the publicity campaign, we believe that the numerous allegations of this intent which appear throughout the complaint may be fairly read to apply to AT&T's publicity campaign.

direct injury as an incidental effect of the railroads' campaign to influence governmental action." 365 U.S. at 142–43, 81 S.Ct. at 532. On the basis of this record, the Court held that, regardless of the railroads' anticompetitive intent in initiating its publicity campaign, "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." 365 U.S. at 135, 81 S.Ct. at 528. Nevertheless, the Court recognized that "there may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. at 533. Thus, the "sham" exception comes into play when the defendant attempts to injure his "competitors not through governmental action but directly." *Kurek v. Pleasure Driveway & Park District of Peoria*, 557 F.2d 580, 592 (7th Cir. 1977).

 Both the *Noerr* immunity and the "sham" exception have been extended to efforts which seek to invoke the processes of judicial and administrative tribunals, the primary difference being that the deception and misrepresentation sometimes associated with legislative and executive lobbying will not be so routinely tolerated in the administrative and adjudicatory settings. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 512, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir. 1975). To state a claim of "sham" activity in the adjudicatory or administrative context, a complainant must

allege that the defendant initiated or interposed a series of "baseless, repetitive claims" with the purpose of destroying, eliminating, or weakening their competitors. *Id.* 408 U.S. at 511, 513, 92 S.Ct. 609. From the filing of MCI's first construction permit application, AT&T has allegedly interposed repetitive and bad faith objections, filed sham tariffs with state regulatory commissions, and filed groundless and deceptive tariffs with the FCC. (Complaint, par. 23(c)(1), (g), (j)(1)).[42] These objections were interposed and these tariffs were filed for the purpose of "suppressing and destroying plaintiffs and restraining competition in the relevant market." (Complaint, 23(1)). Clearly, these allegations state a claim of antitrust violation falling within the sham exception to the *Noerr* immunity. *Otter Tail Power Co. v. United States,* 360 F.Supp. 451 (D.Minn.1973), *aff'd.* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). Thus, AT&T's motion to dismiss these allegations must be denied.[43]

We agree with defendants that the allegations of paragraph 23(m), detailing a massive campaign of deceptive publicity aimed at Congressmen and the executive branch, bear a noticeable similarity to the allegations in *Noerr*. *Noerr,* however, is distinguishable. *Noerr* was decided after trial. Based on a full record, the Court was able to conclude that the railroads' campaign was motivated by the immunized intent of influencing legislators rather than the sham intent of destroying or weakening competitors directly. Our case, however, arises on a motion to dismiss. In deciding such a motion, we must take plaintiffs' allegations about AT&T's publicity campaign as true and must draw all factual inferences most favorably to the plaintiff.

---

**42.** As we noted in an earlier section, the FCC, in ruling on AT&T's interconnection tariffs, was not formulating a new policy but attempting to enforce its rather well-defined *Specialized Common Carriers'* policy. *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1296–98 (5th Cir. 1971).

**43.** AT&T also claims the undisputed facts of record demonstrate its legitimate intent to invoke the administrative process. Without intimating any conclusion on the proper inferences to be drawn from these proceedings, we cannot say that, taken together, these proceedings demonstrate AT&T's good faith as a matter of law.

Proceeding on these principles, we may infer that the publicity campaign injured MCI directly in its relations with customers and the financial community rather than indirectly as a result of governmental action,[44] and we may assume that, by this publicity campaign, AT&T intended to destroy MCI as a competitor rather than to influence legislators or members of the executive branch. Therefore, "another basis for finding *Noerr* protections inapplicable at this stage of the proceedings is that facts provable under the complaint could well establish that [AT&T's publicity campaign] was a 'mere sham' within the meaning of that decision."[45] *Kurek, supra,* 557 F.2d at 594; *United States Dental Institute v. American Ass'n. of Orthodontists,* 396 F.Supp. 565 (N.D.Ill.1975). Therefore, we deny AT&T's motion to dismiss on this ground.

**44.** The complaint may fairly be read as alleging that the campaign was directed at destroying MCI's good will with the public, its present and potential customers and the financial community, certainly not an activity protected by *Noerr.* 365 U.S. at 142–43, 81 S.Ct. 523.

**45.** Of course, even if this allegation was stricken from the complaint, we would still have discretion to admit evidence of the publicity campaign as tending to show the anticompetitive purpose of AT&T's overall scheme. *United Mine Workers of America v. Pennington,* 381 U.S. 657, 670 n.3, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).